UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO.:

LARRY SCIROTTO

    Plaintiff,

v.

CITY OF FORT LAUDERDALE d/b/a
FORT LAUDERDALE
POLICE DEPARTMENT,

    Defendant.
_____/

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**COMES NOW,** Plaintiff, LARRY SCIROTTO ("Plaintiff"), by and through the undersigned counsel, hereby sues Defendant, THE CITY OF FORT LAUDERDALE d/b/a FORT LAUDERDALE POLICE DEPARTMENT (hereinafter "Defendant" and/or "CITY"), and in support thereof alleges as follows:

**INTRODUCTION**

1. This matter arises out of Defendant's breach of contract and wrongful termination of Plaintiff's employment as Chief of Police of the Fort Lauderdale Police Department ("FLPD"). As Chief of Police, Plaintiff was tasked with promoting and establishing greater diversity within the FLPD, as cited publicly by several CITY employees and representatives. Despite complying with CITY's objective to increase diversity among FLPD's workforce in a fair, equitable and legally compliant manner, CITY wrongfully terminated Plaintiff's employment with Defendant.

**PARTIES, JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims arising under statutory and common law pursuant to 28 U.S.C. §1367, because Plaintiff's state law claims are interrelated to Plaintiff's federal law claims arising out a common nucleus of operative facts.

4. At all times material hereto, Plaintiff, LARRY SCIROTTO (hereinafter "Plaintiff" and/or "Mr. Scirotto"), is an individual and was a resident of Broward County, Florida, and is *sui juris*.

5. At all times material hereto, Defendant, CITY OF FORT LAUDERDALE d/b/a FORT LAUDERDALE POLICE DEPARTMENT ("CITY"), is an incorporated Florida municipality located in Broward County, Florida, and is existing under the laws of the State of Florida.

6. At all times material hereto, Defendant is responsible and vicariously liable for the conduct, acts and omissions of its agents, employees, representatives, and apparent agents acting within the course and scope of their employment and/or specified authority.

7. Venue is proper in the Southern District pursuant to 28 U.S.C. §1391(b) because Plaintiff worked for Defendant in this judicial district, the causes of action alleged herein accrued in this judicial district, and at all times material hereto, Defendant was conducting business or otherwise operating in the Southern District of Florida.

## GENERAL ALLEGATIONS

### *Fort Lauderdale Police Department*

8. The Fort Lauderdale Police Department provides law enforcement related services to and on behalf of the CITY.

9. The FLPD is made up of several positions, one of which is titled "Chief of Police."

10. Generally, FLPD's Chief of Police serves as the director of the Police Department, ensures public safety and enforces of federal, state and city laws and regulations.

11. FLPD's Chief of Police administers supervision of assigned staff, which includes analyzing employee performance and overseeing the selection, training, development, motivation, discipline and evaluation of employee performance appraisals.

12. Of note, the Chief of Police's duties include overseeing the hiring/promotional process within FLPD. Ultimately, the Chief of Police has the final decision to appoint and promote employees of various positions and ranks, such as sergeants and lieutenants.

### *Larry Scirotto*

13. Plaintiff, Larry Scirotto, is former Chief of Police of the FLPD who was wrongfully terminated from his position with the FLPD on March 5, 2022.

14. Plaintiff has over twenty-three (23) years of law enforcement experience.

15. From 1995 to 2018, Plaintiff worked in the Pittsburgh Bureau of Police ("PBP") located in and providing law enforcement services to Pittsburgh, Pennsylvania.

16. Throughout his employment with the PBP, Plaintiff held various leadership positions, including but not limited to Patrol Lieutenant, Investigations Commander and Assistant Chief.

17. As Assistant Chief, Plaintiff headed the Professional Standards Branch, which was responsible for officer training and education, wellness, safety and overseeing policy development within the PBP.

18. During his tenure as PBP's Assistant Chief, Plaintiff employed several policies and procedures to increase diversity among PBP's workforce. These very achievements in improving PBP's diversity served as CITY's primary basis for hiring Plaintiff.

***Recruitment, Employment and Wrongful Termination***

19. In the early months of 2021, CITY and FLPD began a search to hire a new Chief of Police.

20. CITY's proposed Chief of Police Recruitment Timeline ("Recruitment Timeline") indicates that a standard search process takes ninety (90) to one hundred twenty (120) days.

21. Notwithstanding, the Recruitment Timeline suggests that the CITY's Manager, Chris Lagerbloom ("Mr. Lagerbloom") make a selection for Chief of Police within eighty-nine (89) days of commencing the search process.

22. The CITY constructed the candidate pool for the FLPD Chief of Police position based on national scale.

23. During its search, CITY recruited Plaintiff to apply for FLPD's Chief of Police Position.

24. On or about April 26, 2021, Plaintiff underwent a candidate interview with Gary Peterson of Public Sector Search & Consulting Inc. ("Mr. Peterson") to discuss the role and position of FLPD's Chief of Police.

25. During this discussion, Mr. Peterson advised Plaintiff that the Chief of Police's duties include creating a diverse organization. Mr. Peterson also expressed that a leader must be *intentional* in creating a diverse organization.

26. Ultimately, CITY narrowed down the pool of potential candidates to eight (8) finalists, including Plaintiff, to undergo interviews with several panels of CITY representatives, employees and community members.

27. The interviews were conducted over the course of several days commencing on or about June 11, 2021.

28. The interview process consisted of four (4) interview panels made up of members from various Ft. Lauderdale organizations, associations and community members, including but not limited to:

   a. Panel 1 consisted of members of the Fraternal Order of Police and Black Police Officer Association;
   b. Panel 2 consisted of members of the Teamsters Union, a Representative of civilian staff and the International Association of Fire Fighters;
   c. Panel 3 consisted of members from citizen review and advocacy groups; and
   d. Panel 4 consisted of representatives from various local businesses, civic/homeowner associations and faith associations.

29. During Panel 1's interview, the president of the Black Police Officer Association ("BPOA"), Cecil Stone ("Mr. Stone"), expressed the perceived lack of fairness among members of the BPOA regarding promotions and special assignments for minority FLPD employees.

30. In response to Mr. Stone's concerns, Plaintiff discussed his perspective on furthering diversity in the FLPD and his previous experience in diversifying the PBP while acting as Assistant Chief.

31. Notably, Panel 3 consisted of representatives from the National Association for the Advancement of Colored People ("NAACP"), advocates for the Lesbian, Gay, Bisexual,

Transgender and Queer ("LGBTQ") community, members of the Police Civilian Review Board and other citizen review and advocacy groups.

32. Also present during Panel 3's interview was the Director of the CITY'S Human Resources Department, Tarlesha Smith ("Ms. Smith").

33. Panel 3's interview questions focused primarily on the diversity of employees within FLPD including extensive discussion about increasing diversity among FLPD's workforce.

34. A substantial part of Panel 3's interview also pertained to Plaintiff's intended role in the diversification of the PBP during Plaintiff's tenure as Assistant Chief.

35. In the days following Plaintiff's panel interviews, Plaintiff met with the CITY's Manager, Mr. Lagerbloom.

36. Mr. Lagerbloom drove Plaintiff around the City of Ft. Lauderdale and discussed several aspects of the FLPD, including Plaintiff's intended plans to increase diversity within the FLPD should Plaintiff be hired as Chief of Police.

37. During this meeting, Mr. Lagerbloom placed great emphasis on the need for FLPD's demographic makeup to "reflect the community" and insinuated the FLPD needed to hire a greater number of minorities and promote minorities to hire ranking positions within the FLPD.

38. In addition, Mr. Lagerbloom discussed Plaintiff's interviews with Nashville and Grand Rapids police departments, highlighting Plaintiff's comments on the need for police forces to be reflective of the community they serve.

39. In response to Mr. Lagerbloom's comments, Plaintiff said he would seek to increase diversity of the FLPD by first considering the demographic makeup of leadership positions within the FLPD.

40. To that end, Mr. Lagerbloom informed Plaintiff that he will likely encounter resistance and opposition from members of the FLPD regarding Plaintiff's plan to further diversity among FLPD's workforce.

41. Notwithstanding, Mr. Lagerbloom assured Plaintiff of his unwavering support for Plaintiff's plans to build a diverse workforce within FLPD.

42. At the end of this meeting, Mr. Lagerbloom extended a verbal offer to Plaintiff for the FLPD Chief of Police position, which Plaintiff accepted.

43. That same evening, Plaintiff was invited to and attended dinner with the local Fraternal Order of Police President, Brandon Diaz ("Mr. Diaz"), and the CITY'S Director of the Human Resources Department, Ms. Smith, at YOLO Restaurant, located in Ft. Lauderdale, Florida.

44. Similar to Plaintiff's conversations with Mr. Lagerbloom, Mr. Diaz and Ms. Smith discussed the need to increase diversity within FLPD and Plaintiff's proposed plans to increase diversity as Chief of Police.

45. On or about June 20, 2021, Plaintiff attended lunch with Mr. Lagerbloom and the Mayor of Fort Lauderdale, Dean Trantalis ("Mayor Trantalis"). During this lunch, Mr. Lagerbloom and Mayor Trantalis again emphasized the need for the FLPD to "reflect" the community.

46. Plaintiff reiterated his achievements in increasing diversity within the PBP and explained how he can implement similar plans, policies and procedures to diversify the FLPD's workforce.

47. Mayor Trantalis warned Plaintiff he will likely be met with objections from members of FLPD in attempting to diversify the FLPD.

48. However, Mayor Trantalis assured Plaintiff that he had the support of Mr. Lagerbloom, the Fort Lauderdale City Commission and the community.

49. Also during this conversation, Mayor Trantalis asked Mr. Lagerbloom if Fort Lauderdale's population was primarily minority, to which Mr. Lagerbloom responded, "not yet."

50. Moreover, despite Mr. Lagerbloom's previous discussions with Plaintiff where he emphasized the CITY's need to increase diversity among FLPD's workforce, Mr. Lagerbloom stated to Mayor Trantalis he was "not sure" about the demographic makeup of the FLPD.

51. On or about June 25, 2021, Mr. Lagerbloom provided Plaintiff with a formal written Offer of Employment as Chief of Police for the CITY, which Plaintiff accepted. See Offer of Employment attached hereto as **Exhibit A**[1]

52. Plaintiff's first day of employment as Chief of Police of FLPD was on or about August 16, 2021.

53. In the beginning weeks of Plaintiff's employment as Chief of Police, promotional eligibility lists were due to expire, necessitating Plaintiff to make certain promotions within FLPD.

54. Between August 28, 2021 through November 10, 2021, Plaintiff promoted fifteen (15) FLPD employees.

---

[1] Plaintiff is not in possession of the fully executed written Offer of Employment. Upon information and belief, Defendant is in possession of a copy of this Offer of Employment signed by Plaintiff.

55. Plaintiff recruited the assistance of FLPD senior staff members of varying rank and experience to consult and assist him in the promotional decision-making process.

56. Plaintiff invited all eligible candidates for promotion to submit resumes and meet with Plaintiff and the group of FLPD senior staff he assembled to assist in the promotional process.

57. During his tenure as Chief of Police, Plaintiff promoted fifteen (15) FLPD employees selected from a pool of qualified candidates – a breakdown of the promoted employees' race and ethnicity is as follows:

   a. Nine (9) white males;
   b. One (1) white female;
   c. Two (2) black males;
   d. One (1) black female;
   e. One (1) Hispanic male; and
   f. One (1) Hispanic female.

58. Notably, nine (9) out of (15) fifteen FLPD employees promoted by Plaintiff were white males.

59. Although nine 9 of the 15 employees promoted were white males, Mr. Scirotto received significant opposition from FLPD employees demanding that Mr. Scirotto promote an even greater number of white employees.

60. On October 11, 2021, CITY Attorney, Alain Boileau ("Mr. Boileau"), Mr. Lagerbloom and Ms. Smith informed Plaintiff that there was an Equal Employment Opportunity Commission ("EEOC") complaint filed against him for alleged discriminatory promotion practices.

61. On October 14, 2021, Plaintiff met with Mr. Lagerbloom and Ms. Smith to review Plaintiff's promotional decision-making process.

62. Mr. Lagerbloom and Ms. Smith concluded that Plaintiff's promotional process was appropriate.

63. Mr. Lagerbloom and Ms. Smith did not request or recommend that Plaintiff include Mr. Lagerbloom and Ms. Smith in any future promotional or hiring decisions.

64. Notwithstanding, on or around November 22, 2022, CITY entered into an agreement with Gregg Rossman, Esq. of Rossman Legal ("Mr. Rossman") to investigate "various complaints and allegations of workplace discrimination at [FLPD]" related to employee promotions.

65. On or around January 28, 2022, Mr. Rossman interviewed Plaintiff regarding Plaintiff's promotional decision-making process, including Plaintiff's reasoning for promoting and not promoting each potential candidate.

66. A general breakdown of Mr. Rossman's Investigative Report dated February 25, 2022 ("Investigative Report") is as follows:

   a. CITY gave Mr. Rossman "complete freedom to investigate the matter by 'gathering and reviewing relevant records, interviewing relevant witnesses'[.]"
   b. Around four (4) to six (6) employees may have alleged a complaint or complaints invoking possible EEOC violations related to alleged preference given in the promotional process based on gender or race.
   c. Mr. Rossman reviewed "governing documents" including relevant Collective Bargaining Agreements, City Codes/Ordinances, City Human Resources Department Policy, EEOC guidelines and relevant case law.
   d. Mr. Rossman conducted approximately twenty-one (21) interviews from December 2021 through January 2022 with potential witnesses to the allegations contained in the EEOC complaints and grievances, including Plaintiff and potential candidates that were not selected for a promotion.
   e. Mr. Rossman concluded that "there is a very divisive atmosphere within [FLPD] based on the perception the [Plaintiff] is intentionally using race, gender and sexual orientation as attributes necessary for promotions."

See Investigative Report attached hereto and incorporated herein as **Exhibit B**.

67. It was not until a meeting with Ms. Smith on or around March 3, 2022 when Plaintiff was first presented with the Investigative Report delineating Mr. Rossman's findings during his investigation into the EEOC complaint and grievances alleged against Plaintiff.

68. At this March 3 meeting, Plaintiff read the Investigative Report and provided notations of all factual inaccuracies contained therein.

69. During this March 3 meeting, Ms. Smith made several adverse statements about CITY's staff including how "terrible" the people are and that she tried to warn Plaintiff of the backlash he would receive from FLPD employees when attempting to increase diversity among the FLPD staff.

70. At the conclusion of this meeting, Plaintiff returned the annotated version of Mr. Rossman's Investigative Report to Ms. Smith. Plaintiff was not provided with a copy of the Investigative Report at this time.

71. On March 5, 2022, Plaintiff attended a meeting called by Mr. Lagerbloom, Ms. Smith and Mr. Boileau wherein CITY terminated Plaintiff from his position as Chief of Police and his employment with FLPD based on the findings contained in the Investigative Report.

72. At this March 5 meeting Mr. Lagerbloom presented a copy of the Investigative Report to Plaintiff and stated, "I cannot defend this [referencing Investigative Report]" and "we are at the end of the road." Mr. Boileau added "the decision is already made; you violated the law."

73. At the conclusion of this meeting, Plaintiff was effectively terminated from his position as FLPD's Chief of Police, approximately nine (9) months after his accepting of the position.

74. Notwithstanding, Mr. Lagerbloom expressly admitted "with certainty that everyone promoted is absolutely qualified for the role in which they now serve" in an email dated March 13, 2022. See Email dated March 13, 2022 attached hereto as **Exhibit C**.

75. Thus, CITY recognizes that all employees promoted by Plaintiff were "absolutely qualified" despite alleging that Plaintiff was terminated for purportedly engaging in discriminatory promotion practices.

76. As set forth above, CITY was undeniably aware of Plaintiff's hiring and promotion practices *before* the EEOC complaint was filed against Plaintiff.

77. At no point in time between his hiring and termination did CITY provide Plaintiff with training or guidance (apart from CITY's repeated emphasis on the need to increase diversity within FLPD) pertaining to the hiring and promotion process of FLPD employees, including all times *after* CITY learned of the EEOC complaints and grievances alleged against Plaintiff.

78. Although CITY's termination of Plaintiff is premised on the Investigative Report, the Investigative Report can hardly be considered reliable as a majority of the interviews conducted by Mr. Rossman were with disgruntled employees who likely have a negative bias towards Plaintiff due to their failure to receive a promotion.

79. Specifically, approximately eighty (80) people were invited to give a statement regarding Plaintiff's alleged workplace discrimination, however, only twenty-one (21) people responded. Essentially, only persons resentful towards Plaintiff participated in Mr. Rossman's interviews.

80. Moreover, the Investigative Report notes that several witnesses spoke of private conversations that were "impossible to independently verify." Rather, Mr. Rossman purports that

he believes his findings are "credible" when "viewed with the totality of similar comments" made during his interviews.

81. Plaintiff has incurred significant damages due to his wrongful termination premised on a haphazard, targeted and inherently biased report.

82. Despite his previously untarnished service as a head of law enforcement and city official, Plaintiff has been deprived of due process and has instead been judged in the court of public opinion without any meaningful opportunity to defend himself.

**COUNT I**
**BREACH OF CONTRACT**

83. Plaintiff realleges and incorporates all allegations contained within Paragraphs 1 - 82 of the Complaint as fully set forth herein.

84. This is a cause for breach of contract arising out of Plaintiff's employment with the CITY as Chief of Police of FLPD.

85. On or about June 25, 2021, CITY and Plaintiff formed a contract for employment, by which Plaintiff was to serve as Chief of Police in exchange for meeting CITY's objectives for the position, payment of a salary and other financial benefits.

86. More specifically, CITY tasked Plaintiff with hiring/promoting FLPD employees.

87. During his tenure as Chief of Police, Plaintiff promoted fifteen (15) FLPD employees all of which were selected in a fair, equitable and legally compliant manner.

88. A select few employees were promoted based on merit and in accordance with the objectives explicitly set forth by CITY's representatives, including but not limited to, Mr. Lagerbloom, Ms. Smith and Mayor Trantalis.

89. Notwithstanding, CITY wrongfully terminated Plaintiff from his employment with FLPD for complying with CITY's demands to increase diversity among FLPD, thereby breaching Plaintiff's contract for employment.

90. But for CITY's unwarranted actions, Plaintiff stood to serve another sixteen (16) years in law enforcement and receive the benefit of earned pension payments, for which he is no longer eligible.

91. As a direct result of CITY's breach of the Plaintiff's employment agreement, Plaintiff has incurred, and continues to incur, damages.

92. As a direct result of CITY's breach of the Plaintiff's employment agreement, Plaintiff was forced to retain counsel and is obligated to pay reasonable attorneys' fees and costs in connection with the prosecution of this action.

**WHEREFORE,** Plaintiff, LARRY SCIROTTO, respectfully request this Honorable Court enter an Order awarding damages against Defendant, CITY, in favor of Plaintiff, together with such further and additional relief as this Honorable Court deems just and proper.

## COUNT II
## DEFAMATION

93. Plaintiff realleges and incorporates all allegations contained within Paragraphs 1 - 82 of the Complaint as fully set forth herein.

94. At all times relevant hereto, CITY has acted by and through its agents and/or employees.

95. Prior to the filing of this Complaint, CITY communicated knowingly false, defamatory statements that were published concerning Plaintiff's alleged discriminatory hiring/promotional practices to various media outlets with the intention of the false, defamatory statements being published.

96. More specifically, CITY, by and through its agents, falsely stated to various media outlets that Plaintiff was terminated as FLPD's Chief of Police for engaging in discriminatory hiring/promotional practices despite encouraging Plaintiff to promote diversity among FLPD's workforce and previously stating to Plaintiff that his hiring/promotional practice were legal.

97. At the time said false and defamatory statements were made by CITY to media outlets for the purpose of publication, CITY knew the statements were false and inaccurate.

98. These false statements about Plaintiff were published to third parties.

99. These false statements were made intentionally with malice by CITY and with the specific intent of damaging the reputation of Plaintiff.

100. The intentional and wrongful conduct of CITY caused damages to Plaintiff, including irreparable damages to his reputation, embarrassment and lost wages.

101. Any and all presuit requirements have been met and/or waived prior to filing this action.

**WHEREFORE,** Plaintiff, LARRY SCIROTTO, respectfully request this Honorable Court enter an Order awarding damages against Defendant, CITY, in favor of Plaintiff, together with such further and additional relief as this Honorable Court deems just and proper.

## COUNT III
## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT
## 42 U.S.C. § 2000d et seq.

102. Plaintiff realleges and incorporates all allegations contained within Paragraphs 1 - 82 of the Complaint as fully set forth herein.

103. This is an action for violation of Title VI of the Civil Rights Act, which is codified at 42 U.S.C. § 2000d et seq. ("Title VI").

104. Title VI prohibits discrimination based on race, color, or national origin in programs and activities receiving federal financial assistance. 42 U.S.C. § 2000d.

105. Once an entity receives federal financial assistance, jurisdiction under Title VI attaches and if the recipient's program includes selection of contractors to carry out its various functions, then Title VI covers that selection process.

106. To start, CITY is a "program" within the meaning of Title VI.

107. Pursuant to 42 U.S.C. § 2000d-4a(1), a program means "all of the operations of (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." See 42 U.S.C. § 2000d-4a(1)(A)-(B); *see also* 42 U.S.C. § 2000d-4a(4)(stating that a program is any other entity which is established by two or more of the entities described in 42 U.S.C. § 2000d-4a(1)(1)).

108. Here, FLPD is a department of CITY that provides law enforcement related services to and on behalf of the CITY, a local government entity.

109. Additionally, CITY is responsible for the discriminatory conduct as it ultimately terminated Mr. Scirotto's employment with FLPD. *See United States v. City of Yonkers*, 880 F. Supp. 212, 232 (S.D.N.Y. 1995) (holding that an entire state or local government may be liable for Title VI violations if it is partially responsible for the discriminatory conduct, is contractually obligated to comply with Title VI, or has a responsibility to monitor subrecipients).

110. Next, CITY received federal financial assistance at all times material hereto.

111. In 2021, CITY received $7,749,139.00 in federal grants.² CITY is estimated to have received $12,138,184.00 in federal grants in 2022. *Id.* at 19 n.2.

112. Notably, CITY budgeted $291,820 of government funds towards new, additional positions at FLPD in 2022.³

113. Since CITY is a direct recipient of federal financial assistance, CITY is subject to the requirements of Title VI.

114. Based on the foregoing, CITY is subject to the requirements of Title VI because CITY, individually, and by and through FLPD, is a program that receives federal financial assistance.

115. The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (*quoting Alexander v. Sandoval,* 532 U.S. 275, 280 (2001)).

116. It is well-settled that Title VI supports retaliation claims. *See, e.g., Peters v. Jenney*, 327 F.3d 307, 318 (4th Cir. 2003); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 83 (D.D.C. 2003); *Gutierrez v. Wash. Dep't of Soc. & Health Servs.*, CV-04-3004-RHW, 2005 WL 2346956, at *5 (E.D. Wash. Sept. 26, 2005).

117. The Supreme Court has defined retaliation as an intentional act in response to a protected action. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005); *Gutierrez*, 2005 WL 2346956, at *5.

---

² See City of Fort Lauderdale FY 2023 Adopted Budget, All Funds Revenue Summary at pg. 84; *https://www.fortlauderdale.gov/home/showpublisheddocument/72367/638072264064230000*
³ See City of Fort Lauderdale FY 2022 Adopted Budget, All Funds Revenue Summary at pg. 50; *https://www.fortlauderdale.gov/home/showpublisheddocument/64530/637758537633970000*

118. Importantly, the Court need not find that the underlying conduct about which the individual complained is discriminatory in order for the retaliation protection to attach. *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994); *accord Ray v. Ropes & Gray LLP*, 961 F. Supp. 2d 344, 358 (D. Mass. 2013) (*quoting Wyatt*), aff'd, 799 F.3d 99 (1st Cir. 2015); *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006).

119. To prevail on a retaliation claim under Title VI, a claimant must show that: (1) the claimant engaged in protected activity of which the recipient was aware; (2) the recipient took a significantly adverse action against the individual; and (3) a causal connection exists between the individual's protected activity and the recipient's adverse action. *See Peters*, 327 F.3d at 320; *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1223 (9th Cir. 2012); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013).

120. First, Mr. Scirotto engaged in protected activity that CITY was aware of as CITY hired Plaintiff with explicit instruction to promote and establish greater diversity within the FLPD, as cited publicly by several CITY employees and representatives.

121. During Mr. Scirotto's tenure as Chief of Police, six (6) of the fifteen (15) FLPD employees he promoted were minorities. Nine (9) out of (15) fifteen FLPD employees promoted were white males.

122. It should be noted that during the promotional process, FLPD employees, acting as agents of CITY, repeatedly urged Mr. Scirotto to promote white-male FLPD employees out of a pool of several qualified employees consisting of different races, ethnicities and genders.

123. Despite assuring Plaintiff that it will support Plaintiff's hiring/promoting of diverse, qualified candidates, CITY terminated Plaintiff's employment for this very same reason.

124. In essence, CITY endorsed the hiring/promoting of white male employees over other diverse, qualified candidates by subsequently disapproving of Plaintiff's decisions to promote diverse candidates, which CITY previously encouraged.

125. Mr. Scirotto's promotion of six (6) minority FLPD employees constitutes objections to CITY's racist and prejudicial hiring/promotional practices, which were in violation of Title VI.

126. Thus, Mr. Scirotto opposed CITY's discriminatory promotional practices, which Mr. Scirotto reasonably and in good faith believed violated Title VI. *Peters*, 327 F.3d at 320-21; *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1503 (11th Cir. 1990).

127. Second, CITY took significantly adverse actions against Mr. Scirotto when it launched an unwarranted and retaliatory investigation against Mr. Scirotto for allegations of workplace discrimination at FLPD related to employee promotions and terminated Plaintiff from his position as Chief of Police purportedly based on Plaintiff's alleged discriminatory hiring/promotional practices.

128. Third, Mr. Scirotto's employment with FLPD was terminated as a direct and proximate cause of his objection and refusal to participate in FLPD's racist and prejudicial promotion/hiring practices, which occurred shortly after Mr. Scirotto disclosed FLPD's discriminatory promotion practices to the CITY.

129. Therefore, CITY's retaliatory termination of Mr. Scirotto is an act of intentional discrimination in direct violation of Title VI.

130. As a result, Mr. Scirotto has suffered, is now suffering, and will continue to suffer, direct pecuniary losses as a result of CITY's above-described violations of the Title VI.

WHEREFORE Plaintiff, LARRY SCIROTTO, respectfully request this Honorable Court enter an Order:

a. Declaring CITY's conduct to be in violation of Mr. Scirotto's rights under Title VI;
b. Entering an injunction restraining CITY from continuing to violate Title VI;
c. Reinstating Mr. Scirotto to the same position held with the CITY before the adverse personnel action, or to an equivalent position;
d. Reinstating Mr. Scirotto's pension benefits;
e. Awarding Mr. Scirotto compensatory damages, including equal to lost wages, benefits, and other remuneration;
f. Awarding Mr. Scirotto any other compensatory damages allowable pursuant to Title VI; and
g. Granting such other and further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Dated: March 3, 2023.

Respectfully Submitted,

**DI PIETRO PARTNERS, LLP**
901 East Las Olas Blvd, Suite 202
Fort Lauderdale, FL 33301
Primary Email Address:
*service@ddpalaw.com*
Secondary Email Address:
*paralegal@ddpalaw.com*
Telephone: (954) 712-3070
Facsimile: (954) 337-3824

*/s/ Nicole Martell*
**DAVID DI PIETRO, ESQ.**
Florida Bar No.: 10370
*david@ddpalaw.com*
**NICOLE MARTELL, ESQ.**
Florida Bar No.: 100172
*nicole@ddpalaw.com*