# EXHIBIT B



6840 Griffin Rd. • Davie, FL 33314 • Phone: 954.440.0908 • www.rossmanlegal.com

Chris Lagerbloom 25 February 2022
City Manager
City of Fort Lauderdale
100 North Andrews Avenue
Fort Lauderdale, FL 33301

Dear Mr. Lagerbloom:

On November 22, 2021 the City entered an agreement with Rossman Legal wherein this author was tasked with investigating "various complaints and allegations of workplace discrimination at the Fort Lauderdale Police Department related to recent promotions." The City was seeking an independent investigation from outside its own organizational structure. The Scope of Services called for "objective investigative services regarding the matter." In this role, I was given complete freedom to investigate the matter by "gathering and reviewing relevant records, interviewing relevant witnesses" and the agreement required "preparing a report" of my findings. This document summarizes my investigation and serves as the "report of my findings" as spelled out in the "Scope of Services."

I stand ready to discuss the report and the basis for its findings at your convenience.

Sincerely,

Gregg Rossman

## Investigation of Complaints of Discrimination

I was advised that somewhere between four (4) to six (6) employees may have alleged a complaint or complaints invoking possible Equal Employment Opportunity Commission (EEOC) violations directly related to the matter. I was advised that four (4) employees were represented by counsel. I was provided the names of employees that "might" have relevant information. I was provided documents for review including two (2) filed "grievances", three (3) promotional eligibility lists, and a press release related to promotions. I reviewed relevant Collective Bargaining Agreements, City Codes/Ordinances, City Human Resources Department Policy, EEOC guidelines and relevant case law. I was provided a private setting to interview City employees without input or participation by City staff.

I broke out the scope of the work into several stages. First, there was a review of "governing documents" including those stated above. Second, there was a review of EEOC guidance and case law. Third, interviews were conducted with a number of employees relating to the matter. Finally, there was an independent analysis conducted by this investigator. The purpose of this report is to relate the findings of my investigation. It is the product of the above described process.

## Stage 1: Governing Document Review
## Collective Bargaining Agreements

The first grievance alleged a violation of "Article 6, Section 3." The grievance listed two classes of employees - sergeants and lieutenants - as complainants. This is significant because sergeants work under a particular collective bargaining agreement (CBA) with the City.[1] Lieutenants work under a separate CBA.[2] Upon reviewing Article 6 in each "Agreement," the language was found to be exactly the same and the relevant sections are re-stated here:

ARTICLE 6 - EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION

**Section 1**   The City and the Union agree to full and unequivocal cooperation with each other in eliminating all unlawful discrimination and to assure all personnel programs, policies, and assignments are free from unlawful discriminatory practices.

**Section 3**   There shall be no unlawful discrimination by the City in employment, employment opportunities or job actions on the basis of race, creed, color, religion, age, sex, national origin, disability, sexual orientation, gender identity, familial status or marital status, or other characteristic protected by law unless one or more of the above constitute a bona fide occupational qualification within the meaning of the law. No present employee will be unlawfully discriminated against or given preference because of any of the above characteristics, unless otherwise required by law.

---

[1] 2020-2022 Agreement between the City of Fort Lauderdale and the Fort Lauderdale Police Lodge 31 Police Officers and Sergeants.
[2] 2020-2022 Agreement between the City of Fort Lauderdale and the Fort Lauderdale Police Lodge 31 Lieutenants and Captains.

Author: Gregg Rossman, Esq.                                                                                                                    25 Feb 2022
Page **1** of **12**         Report of Investigation In Re: EEO Complaints in FLPD Promotional Process

This grievance alleged a "preference given in the promotional process based on gender or race."

The second grievance likewise listed two classes of employees - sergeants and lieutenants - as complainants. Again, this is significant because both Article 36 and Article 37 are very different in the two relevant Agreements.

The second grievance simply alleged "Grievance: Article 37, Section 7 but not limited to; Candidates passed over for promotion shall have the right to appeal beginning at Step 3 of the Grievance Procedure." However, Article 37 in each CBA deals with "Shift Assignments" and has no relevance to the matter alleged.

It appears the complainants intended to invoke Article 36 – Promotional Examinations, Section 7 in the CBA pertaining to Officers and Sergeants. The grievance references some language found therein. Article 36, Section 7 in this CBA states:

> **Section 7.** Promotional scores shall be whole numbers, and the Police Chief shall have the right, when recommending appointments, to choose from the top five (5) candidates certified. Candidates passed over for promotion shall have the right to appeal beginning at Step 3 of the Grievance Procedure. If tie scores result in more than five (5) candidates being certified, the Police Chief may choose for promotion from the larger number.

This language does not exist in "Article 36 – Promotions" in the CBA pertaining to Lieutenants and Captains. Therefore, this grievance as written does not apply to any Lieutenant or Captain.

Assuming arguendo this grievance applies to all complainants listed, it appears to state a complaint about a contractual grievance process but makes no overt or implied allegation of discrimination of any kind. Therefore, this issue is outside the scope of this investigation and the author will offer no finding related to it.

## City Codes/Ordinances

The City of Fort Lauderdale codifies its commitment to protecting individuals from discrimination primarily in Chapter 29 of its Code. Chapter 29 is titled "Human Relations." Relevant sections are cited here:

> ARTICLE I. - IN GENERAL
> The general purpose and intent of this chapter is:
>
> (1) To express support within the city for the policies embodied in the Broward County Human Rights Act of 2011, as amended; Titles II, III, and VII of the Federal Civil Rights Act of 1964, as amended; Title VIII of the Federal Civil Rights Act of 1968, as amended; Section 504 of the Federal Rehabilitation Act of 1973, as amended; the Civil Rights Act of 1991, as amended; the Age Discrimination and Employment Act of 1967, as amended; the Americans with Disabilities

Act of 1990, as amended; the Florida Civil Rights Act of 1992, as amended; and other federal, state, and county anti-discrimination laws; and

(2) To secure for all individuals within the city freedom from discrimination because of race, color, religion, sex, national origin, age, marital status, political affiliation, familial status, disability, sexual orientation, pregnancy, gender identity or expression, veteran or service member status, lawful source of income, or being the victim of dating violence, domestic violence, or stalking, in connection with employment, housing and public accommodations, or real estate transactions, where applicable, and thereby to promote the interests, rights, and privileges of individuals within the city.

This chapter shall be liberally construed to further the general purposes stated in this chapter. The provisions of this chapter shall be construed consistent with similar federal and state statutes and Broward County ordinances.

Sec. 29-2. - Definitions.
Aggrieved person means any person who claims to have been injured by a discriminatory practice. Discriminatory employment practice means an act that is unlawful under Article II of this chapter and Article VI, as it relates to acts made unlawful under Article II of this chapter. Discriminatory practice means an act or practice designated as unlawful under the terms of this chapter.

ARTICLE II. - DISCRIMINATION IN EMPLOYMENT
Sec. 29-11. - Discriminatory practices in employment.
(6) Discriminatory information gathering. Except as permitted by ordinance, by applicable federal, state, or county law, or by bona fide occupational qualifications, it is a discriminatory practice for an employer or employment agency:

a. To elicit information about an employee's race, color, religion, sex, national origin, age, marital status, political affiliation, disability, sexual orientation, pregnancy, or gender identity or expression; or

The city commission shall not adopt any ordinance or regulation that authorizes an employer to disclose information that is otherwise prohibited from disclosure pursuant to federal, state, county, or local law.

The City has clearly stated in the above quoted sections that it follows federal and state law and county ordinances applicable to discrimination generally and employment discrimination specifically. The City defines discriminatory practices in employment in Article II. Of note, Section 29-11, subsection (6) declares it "discriminatory" to elicit information about an employee's race, color, religion, sex, national origin, age, marital status, political affiliation, disability, sexual orientation, pregnancy, or gender identity or expression.

**City Human Resources Department Policy**
**The City's Non-Discrimination/Harassment Policies**

The following Notices are taken verbatim directly from the Human Resources page on the City website. The emphasis is original as it appears on the website:

The City of Fort Lauderdale is **AN EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION EMPLOYER.** All applicants receive consideration for employment without regard to age, ancestry, color, marital status, sexual orientation, national origin, disability, political affiliation, race, religion, creed, sex or other non-merit factors (except as limited by law, Personnel Rules, Collective Bargaining Agreements, or bona fide occupational qualifications).

**Title VI Notice of Compliance**
It is the policy of the City of Fort Lauderdale, under Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975; Section 324 of the Federal-Aid Highway Act of 1973; Civil Rights Restoration Act of 1987**;** and related statutes and regulations, that no person shall on the basis of race, color, national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination or retaliation under any federally or non-federally funded program or activity administered by the City or its sub-recipients.

Although these statements do not carry the authority of an ordinance, they do make clear the City's total commitment to ensuring no individual suffers discrimination particularly within the employment practices of the City.


**Stage 2 EEOC Guidelines**

The EEOC reference manual was reviewed and utilized for guidance. The following sections are taken directly from the EEOC and relevant cases.[3]

**Conducting A Thorough Investigation**
Because discrimination often is subtle, and there rarely is a "smoking gun," determining whether race played a role in the decision making requires examination of all of the surrounding facts and circumstances. The presence or absence of any one piece of evidence often will not be determinative. Sources of information can include witness statements, including consideration of their credibility; documents; direct observation; and statistical evidence such as EEO-1 data, among others.

Title VII also does not permit racially motivated decisions driven by business concerns – for example, concerns about the effect on employee relations, or the negative reaction of clients or customers. Nor may race or color ever be a bona fide occupational qualification under Title VII.

---

[3] See EEOC Compl. Man., Vol. I, Sec. 26

**Race/Color Discrimination & Work Situations**

The law forbids discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment.

**Potential Evidence of Racial Disparate Treatment**

*Race-related statements (oral or written) made by decisionmakers or persons influential to the decision.* Race-related statements include not only slurs and patently biased statements, but also "code words" that are purportedly neutral on their face but which, in context, convey a racial meaning. The credibility of the witnesses attesting to discriminatory statements, and the credibility of the witnesses denying them, are critical to determining whether such statements actually were made. If racially discriminatory statements were made, their importance will depend on their egregiousness and how closely they relate – in time and content – to the decision in question. For example, a statement that there are "too many Asians" in a department, made by a hiring official when discussing applicants, would be strong evidence supporting an Asian American's failure-to-hire claim. Such a statement also would support a claim of hostile work environment by Asian American employees.

*Comparative treatment evidence.* This is evidence as to whether the claimant was treated the same as, or differently than, similarly situated persons of a different race. Such evidence is not always required, but a difference in the treatment of similarly situated persons of different races is probative of discrimination because it tends to show that the treatment was not based on a nondiscriminatory reason. Conversely, an employer's consistent treatment of similarly situated persons of different races tends to support its contention that no discrimination occurred. Comparator evidence that supports either party's position must be weighed in light of all the circumstances. For example, if the group of similarly situated persons who were treated better than the claimant included persons of the claimant's race, that would weaken his or her claim, but it would not be conclusive proof of nondiscrimination because the balance of the evidence overall might still more convincingly point to discrimination. Identification of persons who are similarly situated to the claimant should be based on the nature of the allegations, the alleged nondiscriminatory reasons, and other important factors suggested by the context, but should not be based on unduly restrictive standards.

*Relevant background facts.* Specific employment decisions and issues should not be looked at in isolation. Other information that can shed light on whether the employer's adverse employment decision was motivated by race includes the employer's treatment of other employees (or customers, etc.), race-related attitudes, the work environment generally, and the context of the

challenged employment decision. The point is that background evidence can help determine the employer's state of mind and otherwise provide important context.

*Relevant personnel policies.* An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently applied nondiscriminatory policy or practice would suggest there is no such motive.

**Hiring and Promotion**

The law generally leaves it to the employer's business judgment to determine who should be hired or promoted. Within that context, however, an applicant's race should not affect his or her chances. This means that employers cannot treat persons of different races differently in the hiring or promotion process. Nor may employers use selection criteria that have a significant discriminatory effect without being able to prove that the criteria are job-related and consistent with business necessity. Thus, a sound way for employers both to achieve business goals and to comply with the law is to hire and promote based on job-related ability, as measured by uniform and consistently applied qualification/selection standards.

**Uniform and Consistently Applied Standards**

When making hiring and promotion decisions, employers must apply the same selection criteria to persons of different races, and apply them in the same way, giving the same weight to each criterion for each person. The reasons given for selection decisions should be credible and supported by the evidence.

## Stage 3: Summary of Interviews
## Process

The City provided a pool of "potential witnesses" made up largely from the promotional eligibility lists that were in effect at the relevant time and anyone involved in the promotional process. The pool consisted of sixty-four (64) names.

I determined the best protocol to follow would be to invite witnesses via email. This would ensure each witness received the exact same information in the invite. Each invitation contained the following information: who I was, why I was hired, the process to be followed and the voluntary nature of the invitation. The invitation stated that the meetings would be conducted in person at a Conference Room provided by the city but outside City Hall or the Police Department. It also stated that interviews could be conducted at any other location, via Zoom/WebEx or via telephone if necessary.

Based on the initial information I was provided I decided to give the Chief the first opportunity to meet with me prior to inviting or hearing from any other witnesses. His invitation clearly stated that he did not have to meet with me at all. It also stated that if he agreed to meet, I would

defer to his choice of meeting with me first or to meet with me last after all other interviews were completed. The Chief did not respond to my initial email invitation but at a later time he reached out and stated he would meet with me and we agreed he would be my last interview.

Initially, invitations were sent to twenty-four (24) potential witnesses. Twenty agreed to be interviewed. Sixteen were interviewed in person and four over the phone. If necessary, a second round of interviews were to be set however at the conclusion of these interviews I did not believe any further interviews were warranted.

Witnesses were given a choice of how and where the interview would take place. All witnesses were advised the interviews would not be recorded and no particular statement would be attributed to anyone.[4] All were advised they did not need an attorney but could bring one if they so chose. This was offered to ensure maximum cooperation. Eleven interviews were conducted in a City Conference Room, five in my office and four over the phone. Four interviews were coordinated with and attended by one attorney. These four interviews were conducted first for scheduling purposes. Interviews were taken from early December through the end of January.

Each interview began with a scripted introduction. A rubric of questions was asked of each witness. Witnesses were encouraged to answer in a narrative form to ensure the sharing of as much information as possible. Witnesses were given my contact information and encouraged to follow up with me if anything new came to mind after our interviews. Two people followed up with me after their interviews.

## **Factual Findings**

The interviews with twenty-one (21) witnesses (including the Chief) revealed a consistent narrative revolving around the Chief's vocalization of his outright "intention to promote diversity."[5] The following facts are deemed credible based on the convergence of facts from a broad range of witnesses, interviewed independently from one another.

The Chief on more than one occasion, to different groups of people, pointed to the wall in the Chief's conference room and stated, "that wall is too white"[6] and "I'm gonna change that." The wall displays pictures of FLPD Command Staff.[7] These statements were made in meetings involving General Staff on at least one occasion, Union members on one occasion and when considering promotions for Captain. In the first couple weeks[8] of the Chief's tenure, promotions were being considered because the promotional eligibility lists were due to expire. The Chief said he chose a few members of senior staff of varying rank to assist him in the promotional decision-making process because he was new to the agency and they had a wealth of institutional

---

[4] It would be impossible to shield the Chief from attribution. This was discussed and the Chief stated his comments could be attributed to him. Two other witnesses also agreed to being quoted directly. All witnesses discussed a fear of retribution if they spoke openly to this investigator.

[5] The credibility of the witness statements is further bolstered by Chief Scirotto's use of strikingly similar language in previous interviews for open Chief's positions. In an interview with Metro Nashville on 10/29/2020 he stated, "you have to be intentional about hiring diversity" and in talking about promotions he said leadership must "promote diversity as an intention."

[6] The faces in the group consisted of 17/18 people, 4/5 of whom were from recognized protected classes. (Ethnicity/Gender/Sexual Orientation)

[7] At the time, Fort Lauderdale PD General Staff was defined by the rank of Captain or above.

[8] It is believed the promotional interviews were conducted on or about August 18, 2021.

knowledge. The Chief invited all eligible officers to submit resumes and he invited all of them to meet in person with him and the senior staff he had chosen to assist him.

After the meeting process was completed, the Chief discussed possible promotions with the senior staff he had assembled. The Chief asked the senior staff members who they believed should be promoted. When discussing the open Captain's position, there was unanimity that the person with the second highest score from the testing process (Lt. Charlie Studders) was "very easily" the top choice based on his body of work within the Department.[9] He is a white male with twenty years tenure.

The Chief's response was reported to be:
- "not Charlie"
- "it's between these two" (pointing to the names of Stone and Cruz, two males of color)
- "this is between Cecil and Eddie" (Stone and Cruz)
- "which one is blacker"
- "this wall is too white"

One witness reportedly said, "minority status is not related to the darkness of the pigment of their skin" and "you can't choose someone based on their skin color." The Chief replied, "which one will be more acceptable to the community" or "is this an accurate reflection of the community?"

It is unclear if the Chief made the following statements in this same meeting or just after, but it was said in relation to the Captain's promotion:
- "Cecil obviously looks more black than Eddie."
- "Cecil is blacker than Eddie."

Cecil Stone was promoted to fill the open Captain's position at that time.

In relation to this promotion one of the four candidates was a white female (Lt. Kim Maus). She was told she was promoted in January of 2021 and this was published in a document titled "Memo from the Desk of Interim Chief Karen Dietrich." This document is dated January 22, 2021. This "promotion", along with three others, was invalidated by the City based on a change in status of an allegedly retiring Captain. She remained on the eligibility list when the new Chief was appointed. She was initially listed fourth out of the eligible candidates but six people were in the "Rule of Five."[10]

As stated above, the Chief employed a process to determine how to fill the open positions within the Department. There were four eligible candidates on the expiring Captain's list and there was one open Captain's position in August of 2021. The Chief consulted with senior staff and received input from them. The Chief confirmed that they all advised him that Lt. Charlie Studders, listed number two on the list, was the top choice for this position. According to the Chief, no one recommended Lt. Maus among all four eligible candidates.

---

[9] The expiring eligibility list had four names remaining on it. The Department uses a "Rule of 5" promotional tool so all four were eligible picks within the Chief's discretion despite rankings from the testing process. The second highest score was a 92. The next highest score was an 84. The two bottom scores were 80.

[10] Inexplicably the "Rule of Five" is not limited to five candidates. It could have an unlimited number of eligible candidates as there is no tie breaker among scores so theoretically every person that tests for a promotion could be eligible no matter how many people test.

The Chief personally called each candidate that was considered for promotion – not just the one being promoted.[11] Lt. Maus[12] claims the Chief told her that he "was passing her over and promoting Lt. Cecil Stone." She stated that every person previously promoted on January 22, 2021 and had that promotion rescinded was now being promoted by Chief Scirotto – except for her. Based on that, she went in and met with the Chief on August 23, 2021. She claims in that meeting the Chief said "what happened to those people was unfathomable" in relation to the rescinded promotions. She also stated the Chief told her directly that her "rank provided him the opportunity for some diversity, and I (he) took it. Cecil Stone is a competent black male." Lt. Maus stated this was a "gut punch" and was "humiliating."

Lt. Maus stated the next promotion occurred October 3, 2021. She stated the Chief called her again to advise he was not promoting her and was promoting Lt. Charlie Studders and Lt. Eddie Cruz. She stated that she challenged Chief Scirotto saying "you talk about diversity and on your wall there is only one woman." She stated the Chief replied, "I am promoting Lynette to Major"[13] and "as you can see there are not a lot of brown faces on that wall and I plan to change that."

Sgt. Malushi[14] stated that Chief Scirotto called and advised him "you are being passed over (for a promotion) for Deanna Greenlaw." He stated in this conversation the Chief then offered him praise and told him he was "respected within the organization" and to "keep doing your job. Keep doing what you are doing." Shortly after that conversation, on August 31, 2021, Sgt. Malushi saw Chief Scirotto at an event at the POA Hall and asked him "why am I being passed over?" According to Sgt. Malushi, Chief Scirotto said "I had to consider a lot of things. It was a gut punch to Deanna to lose the promotion (previously rescinded). I have to consider diversity and equity and this gave me an opportunity to get a female in the rank of Lieutenant."

Sgt. Malushi stated that on October 4, 2021 the Chief called him once again to advise that he was not being promoted into either of the two promotions he was making. According to Sgt. Malushi, their conversation went as follows:

- Chief Scirotto "I have two positions. Unfortunately, I did not select you for either. I selected Newman . . ."
- Sgt. Malushi interrupted "let me guess, Auguste."
- Chief replied, "Yes."
- Malushi "shocked"
- Chief remained quiet.
- Malushi "you're promoting a guy with an IA investigation, kicked out of Special Events, IA . . ."
- Chief "that's just where we're at"
- Malushi "I'm senior to both in overall time and rank"
- Chief "that's just where we're at"

---

[11] Past practice the Chief called the person being promoted and an Asst. Chief contacted those not chosen.
[12] She is directly quoted with permission after consultation with counsel.
[13] Referencing Captain Lynette Falzone.
[14] He is directly quoted with permission after consultation with counsel.

- Malushi "so the friends and family plan that dominated promotions . . . we bring you in to change the culture, you say you're a change agent and now under you it's the equity and diversity plan. I'm shit out of luck."
- Chief "that's just where we're at. I've made my decision – this is where we're at."

Sgt. Malushi did not have any further direct conversations with the Chief. He did hear from others after his phone call with the Chief. He was told the Chief said "who's this Malushi guy. I want to punch him in the face." A version of this statement was confirmed by multiple witnesses.

Two other witnesses described conversations with Chief Scirotto when he called to advise they were not being promoted. These statements are attributed to the Chief in those conversations:

- "You are being skipped"
- "I want to take the agency in another direction and to make it more diverse."
- "I didn't pick you. What happened to her was wrong." (re: a rescinded promotion)
- "The wall is too white."

Multiple witnesses directly described conversations with the Chief specifically related to promotions. In a meeting with Senior Staff discussing certain promotions, the Chief told a Senior Staff member that had offered his opinion on a specific choice "what do you care? You already got Steve Johnson the Spanish guy."[15] Four people related individual, private conversations that are, by their private nature, impossible to independently verify. However, when viewed within the totality of similar comments related by a multitude of witnesses and some admissions by Chief Scirotto himself, it is this investigator's belief they are credible.

Chief Scirotto agreed to meet and his interview was intentionally scheduled after all other relevant interviews had been finished. He was asked about the "promotional process" employed upon his hiring as Chief. He said he had open positions to fill immediately and that the promotional lists were expiring. He said he asked for a "90 day extension of the lists and the FOP agreed." He said, as an outsider, he was not familiar with the people eligible for promotions, that he did not have the benefit of long term, institutional knowledge. Based on that, he invited all eligible applicants to submit resumes for consideration and he invited each to meet with him. He chose senior command staff of varying rank and varying experience, along with a road patrol officer to participate in these meetings. After the interviews he discussed the candidates with the senior command staff members.[16] Chief Scirotto admitted the senior command staff he had invited to assist him in this process "unanimously agreed that Charlie was the only choice" for Captain "to fill the one open spot at that time." The Chief stated the decision was his and he believed he could use race as a "tie breaker assuming all other things are equal." He stated he considered "IA files, the resumes and the chat." He said he "choose Cecil because he was a qualified black man with a Master's degree."[17]

Chief Scirotto stated in his interview with me that he was going to "consider diversity at every opportunity." He stated that one had to be "intentional" in their decision making.

---

[15] Sgt. Steve Johnson is apparently of Trinidadian heritage.

[16] The road patrol officer was excused and did not participate in these conversations.

[17] Lt. Cecil Stone was promoted to Captain. It was confirmed he has a Master's degree.

He further stated in his interview that no one in his Command Staff recommended Lt. Maus for promotion and that he considered those recommendations when choosing who to promote.[18] The Chief admitted to making several statements about "the wall being too white." He stated the wall did not reflect the community. He said the context of the comment is built around "how do I convince the community that we are an inclusive and diverse organization if this wall is so white?" He also stated that he asked "do we not have any qualified minority candidates?" He believed these statements were made in a General Staff meeting or a meeting attended by a larger group. One witness recalled the Chief "maybe saying something about the community" in relation to the wall. No other witness recalled him making those statements. When asked if there were "Hispanic faces" or "LGBTQ" faces on the "white wall" the Chief said "he did not see diversity on the wall."[19]

The Chief was asked directly about his question "which one is blacker than the other?" When asked if he had asked that question the following exchange took place:

- Chief "in relation to promotions?"
- Investigator "promotions or any other context."
- Chief "I never said that. I would never say that."

The Chief was asked if he ever said he wanted "to punch Malushi in the face." He did not deny it but said that he was "frustrated" and that he was "likely not the only person that felt that way about Malushi."

## Conclusions

Every single witness was asked about their tenure with the Fort Lauderdale Police Department. Every witness was asked about their experience with prior promotional processes under several different Chiefs. Each and every witness stated they believed the prior promotional "processes" were fair even if the promotional decisions were not always perfect. While each person believed that historically some people were promoted based on favoritism – no one related a belief that promotions were based on immutable traits.

In speaking about the promotions that are the subject of this report, almost every witness was dissatisfied. Most believed that Chief Scirotto made clear his intention to promote based on race, gender or sexual orientation. Some believed it was about time changes were made but stated if promotions were based on things such as race it would even hurt or undermine the people promoted. Overall, there is a very divisive atmosphere within the Department based on the perception the Chief is intentionally using race, gender and sexual orientation as attributes necessary for promotions. While the goal to diversify is an important and laudable goal it must be accomplished in a legally permissible manner. Specifically, diversity must be accomplished in a manner ensuring all members' rights are protected.

---

[18] In this very same promotional process, he admittedly ignored the staff recommendations related to Charlie Studders.

[19] Among the Command Staff at the time there were four or five members of recognized classes including the following: people of color (Hispanic); gender; and LGBTQ.

The Chief's own words, admitted by him, are ill conceived if not plainly discriminatory. They are not part of a well-conceived, adopted plan of affirmative action or diversity implemented by ordinance or court order. The Fort Lauderdale Police Department has a strong history of diversity within the Department particularly within the past two decades. People in legally recognized protected classes have made it to all positions of rank including Captain, Major, Assistant Chief and Chief. Based on the collective testimony of the parties interviewed, this was accomplished most recently without any overt, intentional preference plan to promote diversity. This history is strong evidence that anyone can rise to the highest ranks within the Department based solely on merit.