UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60424-CIV-DIMITROULEAS

LARRY SCIROTTO,

      Plaintiff,

vs.

CITY OF FORT LAUDERDALE d/b/a
FORT LAUDERDALE
POLICE DEPARTMENT,

      Defendant.

_____/

### ORDER ON DEFENDANT'S MOTION TO
### DISMISS PLAINTIFF'S AMENDED COMPLAINT

THIS CAUSE is before the Court upon Defendant City of Fort Lauderdale's Motion to Dismiss Plaintiff's Amended Complaint (the "Motion") [DE 20]. The Court has carefully considered the Motion, Plaintiff Larry Scirotto's Response [DE 22], Defendant's Reply [DE 23], The Court held a hearing on the Motion on September 22, 2023. *See* [DE 26].  The Court is otherwise fully advised in the premises.

### I.      BACKGROUND

Plaintiff Sciroto filed the instant action on March 3, 2023. *See* [DE 1].  Plaintiff filed an Amended Complaint, the operative pleading, on June 13, 2023. *See* [DE 18].

This matter arises out of Defendant City's alleged breach of contract and alleged wrongful termination of Plaintiff's employment as Chief of Police of the Fort Lauderdale Police Department ("FLPD"). *See* [DE 18].  According to Plaintiff's allegations, as Chief of Police, Plaintiff was tasked with promoting and establishing greater diversity within the FLPD, as cited publicly by several CITY employees and representatives. *Id.* at ¶1.  Plaintiff claims that, despite

Plaintiff complying with the City's objective to increase diversity among FLPD's workforce in a fair, equitable and legally compliant manner, the City wrongfully terminated Plaintiff's employment with Defendant. *Id.*

According to the factual allegations of the Amended Complaint, which the Court accepts as true for the purposes of a motion to dismiss:

Defendant City is an incorporated Florida municipality located in Broward County, Florida, and is existing under the laws of the State of Florida. ¶ 5.  The Fort Lauderdale Police Department ("FLPD") provides law enforcement related services to and on behalf of the City. ¶8.  The FLPD is made up of several positions, one of which is titled "Chief of Police." ¶9. Generally, FLPD's Chief of Police serves as the director of the Police Department, ensures public safety and enforces federal, state and city laws and regulations. ¶10.  FLPD's Chief of Police administers supervision of assigned staff, which includes analyzing employee performance and overseeing the selection, training, development, motivation, discipline and evaluation of employee performance appraisals. ¶11.  The Chief of Police's duties include overseeing the hiring/promotional process within FLPD. ¶12.  Ultimately, the Chief of Police has the final decision to appoint and promote employees of various positions and ranks, such as sergeants and lieutenants. ¶12.

Plaintiff Scirotto is an individual and was a resident of Broward County, Florida. ¶4. Plaintiff is former Chief of Police of the FLPD who was terminated from his position with the FLPD on March 4, 2022. ¶13.  Plaintiff has over twenty-three (23) years of law enforcement experience. ¶14.

From 1995 to 2018, Plaintiff worked in the Pittsburgh Bureau of Police ("PBP") located in and providing law enforcement services to Pittsburgh, Pennsylvania. ¶15. Throughout his

employment with the PBP, Plaintiff held various leadership positions, including but not limited to Patrol Lieutenant, Investigations Commander and Assistant Chief. ¶16. As Assistant Chief, Plaintiff headed the Professional Standards Branch, which was responsible for officer training and education, wellness, safety and overseeing policy development within the PBP. ¶17. During his tenure as PBP's Assistant Chief, Plaintiff employed several policies and procedures to increase diversity among PBP's workforce. These very achievements in improving PBP's diversity served as City's primary basis for hiring Plaintiff. ¶18.

In the early months of 2021, CITY and FLPD began a search to hire a new Chief of Police. ¶19. The City's proposed Chief of Police Recruitment Timeline ("Recruitment Timeline") indicates that a standard search process takes ninety (90) to one hundred twenty (120) days. ¶20. Notwithstanding, the Recruitment Timeline suggests that the CITY's Manager, Chris Lagerbloom ("Mr. Lagerbloom") make a selection for Chief of Police within eighty-nine (89) days of commencing the search process. ¶21.

The City constructed the candidate pool for the FLPD Chief of Police position based on national scale. ¶22. During its search, the City recruited Plaintiff to apply for FLPD's Chief of Police Position. ¶23. On or about April 26, 2021, Plaintiff underwent a candidate interview with Gary Peterson of Public Sector Search & Consulting Inc. ("Mr. Peterson") to discuss the role and position of FLPD's Chief of Police. ¶24. During this discussion, Mr. Peterson advised Plaintiff that the Chief of Police's duties include creating a diverse organization. ¶25. Mr. Peterson also expressed that a leader must be intentional in creating a diverse organization. ¶25.

Ultimately, the City narrowed down the pool of potential candidates to eight (8) finalists, including Plaintiff, to undergo interviews with several panels of City representatives, employees and community members. ¶26. The interviews were conducted over the course of several days

commencing on or about June 11, 2021. ¶27.  The interview process consisted of four (4) interview panels made up of members from various Ft. Lauderdale organizations, associations and community members, including but not limited to:

> a. Panel 1 consisted of members of the Fraternal Order of Police and Black Police Officer Association;
> b. Panel 2 consisted of members of the Teamsters Union, a Representative of civilian staff and the International Association of Fire Fighters;
> c. Panel 3 consisted of members from citizen review and advocacy groups; and
> d. Panel 4 consisted of representatives from various local businesses, civic/homeowner associations and faith associations.

¶28.

During Panel 1's interview, the president of the Black Police Officer Association ("BPOA"), Cecil Stone ("Mr. Stone"), expressed the perceived lack of fairness among members of the BPOA regarding promotions and special assignments for minority FLPD employees. ¶29. In response to Mr. Stone's concerns, Plaintiff discussed his perspective on furthering diversity in the FLPD and his previous experience in diversifying the PBP while acting as Assistant Chief. ¶30.

Panel 3 consisted of representatives from the National Association for the Advancement of Colored People ("NAACP"), advocates for the Lesbian, Gay, Bisexual, Transgender and Queer ("LGBTQ") community, members of the Police Civilian Review Board and other citizen review and advocacy groups. ¶31. Also present during Panel 3's interview was the Director of the City's Human Resources Department, Tarlesha Smith ("Ms. Smith"). ¶32. Panel 3's interview questions focused primarily on the diversity of employees within FLPD including extensive discussion about increasing diversity among FLPD's workforce. ¶33. A substantial part of Panel 3's interview also pertained to Plaintiff's intended role in the diversification of the PBP during Plaintiff's tenure as Assistant Chief. ¶34.

In the days following Plaintiff's panel interviews, Plaintiff met with the City's Manager, Mr. Lagerbloom. ¶35.  Mr. Lagerbloom drove Plaintiff around the City of Ft. Lauderdale and discussed several aspects of the FLPD, including Plaintiff's intended plans to increase diversity within the FLPD should Plaintiff be hired as Chief of Police. ¶36. During this meeting, Mr. Lagerbloom placed great emphasis on the need for FLPD's demographic makeup to "reflect the community" and insinuated the FLPD needed to hire a greater number of minorities and promote minorities to hire ranking positions within the FLPD. ¶37.  In addition, Mr. Lagerbloom discussed Plaintiff's interviews with Nashville and Grand Rapids police departments, highlighting Plaintiff's comments on the need for police forces to be reflective of the community they serve. ¶38.  In response to Mr. Lagerbloom's comments, Plaintiff said he would seek to increase diversity of the FLPD by first considering the demographic makeup of leadership positions within the FLPD. ¶39.  To that end, Mr. Lagerbloom informed Plaintiff that he will likely encounter resistance and opposition from members of the FLPD regarding Plaintiff's plan to further diversity among FLPD's workforce. ¶40.  Notwithstanding, Mr. Lagerbloom assured Plaintiff of his unwavering support for Plaintiff's plans to build a diverse workforce within FLPD. ¶41.  At the end of this meeting, Mr. Lagerbloom extended a verbal offer to Plaintiff for the FLPD Chief of Police position, which Plaintiff accepted. ¶42.

That same evening, Plaintiff was invited to and attended dinner with the local Fraternal Order of Police President, Brandon Diaz ("Mr. Diaz"), and the City's Director of the Human Resources Department, Ms. Smith, at YOLO Restaurant, located in Ft. Lauderdale, Florida. ¶43.  Similar to Plaintiff's conversations with Mr. Lagerbloom, Mr. Diaz and Ms. Smith discussed the need to increase diversity within FLPD and Plaintiff's proposed plans to increase diversity as Chief of Police. ¶44.

On or about June 20, 2021, Plaintiff attended lunch with Mr. Lagerbloom and the Mayor of Fort Lauderdale, Dean Trantalis ("Mayor Trantalis"). ¶45.  During this lunch, Mr. Lagerbloom and Mayor Trantalis again emphasized the need for the FLPD to "reflect" the community. ¶45.  Plaintiff reiterated his achievements in increasing diversity within the PBP and explained how he can implement similar plans, policies and procedures to diversify the FLPD's workforce. ¶46.  Mayor Trantalis warned Plaintiff he will likely be met with objections from members of FLPD in attempting to diversify the FLPD. ¶47.  However, Mayor Trantalis assured Plaintiff that he had the support of Mr. Lagerbloom, the Fort Lauderdale City Commission and the community. ¶48.  Also during this conversation, Mayor Trantalis asked Mr. Lagerbloom if Fort Lauderdale's population was primarily minority, to which Mr. Lagerbloom responded, "not yet." ¶49.  And, despite Mr. Lagerbloom's previous discussions with Plaintiff where he emphasized the City's need to increase diversity among FLPD's workforce, Mr. Lagerbloom stated to Mayor Trantalis he was "not sure" about the demographic makeup of the FLPD. ¶50.

On or about June 25, 2021, Mr. Lagerbloom provided Plaintiff with a formal written Offer of Employment as Chief of Police for the City, which Plaintiff accepted. ¶51; *see* [DE 18-1] (Offer of Employment).  Plaintiff's first day of employment as Chief of Police of FLPD was on or about August 16, 2021. ¶52.

In the beginning weeks of Plaintiff's employment as Chief of Police, promotional eligibility lists were due to expire, necessitating Plaintiff to make certain promotions within FLPD. ¶53.  Between August 28, 2021 through November 10, 2021, Plaintiff promoted fifteen

(15) FLPD employees. ¶54.  Plaintiff recruited the assistance of FLPD senior staff members of varying rank and experience to consult and assist him in the promotional decision-making process. ¶55.  Plaintiff invited all eligible candidates for promotion to submit resumes and meet with Plaintiff and the group of FLPD senior staff he assembled to assist in the promotional process. ¶56.  During his tenure as Chief of Police, Plaintiff promoted fifteen (15) FLPD employees selected from a pool of qualified candidates – a breakdown of the promoted employees' race and ethnicity is as follows:

       a. Nine (9) white males;
       b. One (1) white female;
       c. Two (2) black males;
       d. One (1) black female;
       e. One (1) Hispanic male; and
       f. One (1) Hispanic female.

¶57.  Nine (9) out of (15) fifteen FLPD employees promoted by Plaintiff were white males. ¶58.

Although nine 9 of the 15 employees promoted were white males, Plaintiff received significant opposition from FLPD employees demanding that Plaintiff promote an even greater number of white employees. ¶59.  On October 11, 2021, City Attorney, Alain Boileau ("Mr. Boileau"), Mr. Lagerbloom and Ms. Smith informed Plaintiff that there was an Equal Employment Opportunity Commission ("EEOC") complaint filed against him for alleged discriminatory promotion practices. ¶60.

On October 14, 2021, Plaintiff met with Mr. Lagerbloom and Ms. Smith to review Plaintiff's promotional decision-making process. ¶61.  Mr. Lagerbloom and Ms. Smith concluded that Plaintiff's promotional process was appropriate. ¶62.  Mr. Lagerbloom and Ms. Smith did not request or recommend that Plaintiff include Mr. Lagerbloom and Ms. Smith in any future promotional or hiring decisions. ¶63.

On or around November 22, 2021, the City entered into an agreement with Gregg Rossman, Esq. of Rossman Legal ("Mr. Rossman") to investigate "various complaints and allegations of workplace discrimination at [FLPD]" related to employee promotions. ¶64. On or around January 28, 2022, Mr. Rossman interviewed Plaintiff regarding Plaintiff's promotional decision-making process, including Plaintiff's reasoning for promoting and not promoting each potential candidate. ¶65.

A general breakdown of Mr. Rossman's Investigative Report dated February 25, 2022 ("Investigative Report") is as follows:

> a. The City gave Mr. Rossman "complete freedom to investigate the matter by 'gathering and reviewing relevant records, interviewing relevant witnesses'[.]"
> b. Around four (4) to six (6) employees may have alleged a complaint or complaints invoking possible EEOC violations related to alleged preference given in the promotional process based on gender or race.
> c. Mr. Rossman reviewed "governing documents" including relevant Collective Bargaining Agreements, City Codes/Ordinances, City Human Resources Department Policy, EEOC guidelines and relevant case law.
> d. Mr. Rossman conducted approximately twenty-one (21) interviews from December 2021 through January 2022 with potential witnesses to the allegations contained in the EEOC complaints and grievances, including Plaintiff and potential candidates that were not selected for a promotion.
> e. Mr. Rossman concluded that "there is a very divisive atmosphere within [FLPD] based on the perception the [Plaintiff] is intentionally using race, gender and sexual orientation as attributes necessary for promotions."

¶66; *see* [DE 18-2] (Investigative Report).

A majority of the interviews conducted by Mr. Rossman were with disgruntled employees who likely have a negative bias towards Plaintiff due to their failure to receive a promotion. ¶78. Specifically, approximately eighty (80) people were invited to give a statement regarding Plaintiff's alleged workplace discrimination, however, only twenty-one (21) people responded. ¶79. Only persons resentful towards Plaintiff participated in Mr. Rossman's interviews. ¶79. The Investigative Report notes that several witnesses spoke of private

conversations that were "impossible to independently verify." ¶80.  Mr. Rossman stated therein that he believes his findings are "credible" when "viewed with the totality of similar comments" made during his interviews. ¶80.

It was not until a meeting with Ms. Smith on or around March 1, 2022 when Plaintiff was first presented with the Investigative Report delineating Mr. Rossman's findings during his investigation into the EEOC complaint and grievances alleged against Plaintiff. ¶67.  At this March 1 meeting, Plaintiff read the Investigative Report and provided notations of all factual inaccuracies contained therein. ¶68.  During this March 1 meeting, Ms. Smith made several adverse statements about the City's staff including how "terrible" the people are and that she tried to warn Plaintiff of the backlash he would receive from FLPD employees when attempting to increase diversity among the FLPD staff. ¶69.  At the conclusion of this meeting, Plaintiff returned the annotated version of Mr. Rossman's Investigative Report to Ms. Smith. ¶70. Plaintiff was not provided with a copy of the Investigative Report at this time. ¶70.

On March 4, 2022, Plaintiff attended a meeting called by Mr. Lagerbloom, Ms. Smith and Mr. Boileau wherein the City terminated Plaintiff from his position as Chief of Police and his employment with FLPD based on the findings contained in the Investigative Report. ¶71.  At this March 4 meeting Mr. Lagerbloom presented a copy of the Investigative Report to Plaintiff and stated, "I cannot defend this [referencing Investigative Report]" and "we are at the end of the road." ¶72.  Mr. Boileau added "the decision is already made; you violated the law." ¶72.  At the conclusion of this meeting, Plaintiff was effectively terminated from his position as FLPD's Chief of Police, approximately nine (9) months after his accepting of the position. ¶73.

Mr. Lagerbloom expressly admitted "with certainty that everyone promoted is absolutely qualified for the role in which they now serve" in an email dated March 13, 2022. ¶74; *see* [DE 18-3] (Email dated March 13, 2022).

The City was aware of Plaintiff's hiring and promotion practices before the EEOC complaint was filed against Plaintiff. ¶76.  At no point in time between his hiring and termination did the City provide Plaintiff with training or guidance (apart from the City's repeated emphasis on the need to increase diversity within FLPD) pertaining to the hiring and promotion process of FLPD employees, including all times after the City learned of the EEOC complaints and grievances alleged against Plaintiff. ¶77.

In addition to the Investigative Report, CITY's Auditor, John Herbst ("Mr. Herbst"), a City employee at all material times, made defamatory and false statements that were allegedly outside the scope of his authorized duties. ¶81.  Specifically, Mr. Herbst launched an investigation into Mr. Scirotto's part-time employment as a National Collegiate Athletic Association ("NCAA") basketball referee. ¶82.  During Mr. Herbst's investigation, Mr. Herbst knowingly made false statements publicly, purportedly on behalf of the City, which were also published, whereby Mr. Herbst alleged Mr. Scirotto was violating City policy and stealing from the City by purportedly working NCAA sporting events on the same days he was scheduled to work at FLPD. ¶83.

Mr. Herbst's statements were published in an audit report directed to the City's mayor and commissioners dated March 4, 2022 styled "Termination of the Forensic Audit of Telestaff Time Keeping System for Larry Scirotto, Chief of Police for Lack of Independence," Memorandum No: 21/22-07, wherein Mr. Herbst states that "the matters raised in the draft report

merit review for possible criminal violations by Larry Scirotto. ¶84.  The circumstances are similar in nature to those in which a Fort Lauderdale police sergeant was arrested on fraud and theft charges in January 2022." ¶85; *see* [DE 18-4 (Termination of Forensic Audit Report, Memo No: 21/22-07).  In the Forensic Audit Report attached as Exhibit 1 to the Termination of Forensic Audit Report, Memorandum No: 21/22-06, Mr. Herbst states, among other things, that Mr. Scirotto "improperly received payment from the City for regular work days while simultaneously engaged in outside employment and outside employment travel in violation of Florida Statute, the City's Policies and Standards Manual (PSM), and Police Department Standard Operating Procedures." ¶85; *see* [DE 18-4] (Exhibit 1 to Termination of Forensic Audit Report).

Statements were publicly made on behalf of the City and subsequently published, indicating that Mr. Herbst's investigation and allegations against Mr. Scirotto attributed to the CITY's decision to terminate Mr. Scirotto. ¶86.

Ultimately, the City terminated Mr. Herbst from his employment as City Auditor for acting outside the scope of his directives and authority in investigating Mr. Scirotto's part-time employment as a NCAA basketball referee. ¶87.  City officials expressly indicated that Mr. Herbst's investigation of Mr. Scirotto was not authorized and not within the scope of his employment. ¶87.  In a City Commission held on February 15, 2022, the Mayor of Fort Lauderdale, Mayor Trantalis, challenged Mr. Herbst's authority and argued that the scope of Mr. Herbst's job duties do not include conducting independent investigations, such as the one improperly launched against Mr. Scirotto. ¶88.  Mayor Trantalis described Mr. Herbst's investigation of Mr. Scirotto as "rouge" and "a secret investigation without the authority of the commission."  ¶88.  Mayor Trantalis further states that he believes Mr. Herbst's investigation "is

part of an effort to embarrass [Mr. Scirotto] because there are people in the department who are trying to undermine his authority." ¶88.

Plaintiff has incurred significant damages due to his wrongful termination premised on a haphazard, targeted and inherently biased report. ¶89. Despite his previously untarnished service as a head of law enforcement and city official, Plaintiff has been deprived of due process and has instead been judged in the court of public opinion without any meaningful opportunity to defend himself. ¶90.

Based upon the foregoing allegations, Plaintiff's Amended Complaint asserts three claims against the City, as follows: Count I: Breach of Contract; Count II: Defamation; and Count III: Violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, *et seq. See* [DE 18]. Defendant has moved to dismiss the Complaint in its entirety for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## II.     LEGAL STANDARD

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v.*

*Portocarrero*, 963 F. 2d 332, 334–36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

Nevertheless, the Court need not take allegations as true if they are merely "threadbare recitals of a cause of *action's* elements, supported by mere conclusory statements . . ." *Iqbal*, 556 U.S. at 663.  In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984)).

### III.   **DISCUSSION**

#### A.  *Count I: Breach of Contract*

In Count I, Plaintiff alleges a breach of contract claim against the City on the grounds that the City violated the June 25, 2021 contract for employment between the City and Plaintiff, whereby Plaintiff was to serve as Chief of Police in exchange for meeting the City's objectives for the position, payment of a salary and other financial benefits.  ¶¶92-93.  Plaintiff alleges that the City wrongfully terminated Plaintiff from his employment with FLPD for complying with the City's demands to increase diversity among FLPD, thereby breaching Plaintiff's contract for employment. ¶97.

In the Motion to Dismiss, Defendant argues that Plaintiff's breach of contract claim must be dismissed because a breach of contract claim under Florida law fails as a matter of law where the document attached to the Amended Complaint (Plaintiff's "offer of employment" letter) states that the Plaintiff is an "At-Will Employee" with no agreed duration of employment. As explained below, the Court agrees.

It is well established that there is no breach of contract claim under Florida law on an offer letter which does not provide for a definite term of employment and is terminable "at-will." S*avannah, F. & W. Ry. V. Willett*, 31 So. 246 (1901) (holding that no action may be maintained for the breach of an employment contract terminable at-will); *Demarco v. Publix Super Markets, Inc.*, 360 So. 2d 134, 136 (Fla. 3d DCA 1978), *aff'd*, 384 So. 2d 1253 (Fla. 1980) ("The established law is that where the term of employment is discretionary with either party or indefinite, then either party for any reason may terminate it at any time and no action may be maintained for breach of the employment contract."); *Liff v. City of Cocoa*, 745 So. 2d 441 (Fla. 5th DCA 1999) (holding that former police chief could not maintain action for breach of employment contract where offer letter stated that he was an at-will employee); *Ross v. Twenty-Four Collection, Inc.*, 617 So. 2d 428, 428 (Fla. 3d DCA 1993) ("[T]the breach of contract claim is not actionable as a matter of law because it is based on a contract of employment which does not provide for a definite term of employment and was therefore terminable at will. No action may be maintained for the breach of an employment contract terminable at will."); *Lurton v. Muldon Motor Co.*, 523 So.2d 706, 708 (Fla. 1st DCA 1988) (stating "[t]he general rule in Florida is that a contract for employment for an indefinite term is terminable at the will of either the employee or employer, and an action for wrongful discharge will not lie."). *See also Kefeenie v. Gloria Martin Tr.*, No. 17-24346-CIV, 2018 WL 4301558, at *5 (S.D. Fla. Sept. 10, 2018) ("Under Florida law, employment contracts that do not specifically obligate the contracting parties to a definite term of employment are terminable at will and will not support a breach of contract claim for damages."); *Yarcheski v. Keiser Sch., Inc.*, No. 11-61188-CIV, 2012 WL 13005831, at *1 (S.D. Fla. Jan. 30, 2012) (granting defendant's motion to dismiss Florida law breach of contract claim on grounds that plaintiff was an at-will employee and could be

terminated at any time, therefore plaintiff "may not sue for breach of contract,"). As the

Eleventh Circuit explained in affirming the district court's dismissal of a breach of contract claim

in *Yarcheski*:

> After reviewing the agreement at issue here, we conclude that the agreement does
> not provide for a definite duration of employment. There is no mention in the
> agreement that Yarcheski was being employed for a definite period of time.
> Additionally, the agreement expressly states that it is terminable "at-will" and
> "does not imply continued employment for a set period of time." Thus, we agree
> with the district court that under Florida law, the agreement is one for at-will
> employment which cannot support a breach of contract action. Accordingly, we
> affirm the dismissal of Count 1.

*Yarcheski v. Keiser Sch., Inc.*, 508 F. App'x 916, 917 (11th Cir. 2013)

Plaintiff's attempt in his Response to carve out an exception to Florida's black letter law

that no breach of employment contract claim lies for at-will employees – for alleged instances of

a termination for reasons prohibited by law – is misplaced. "The law concerning the at will

doctrine is well entrenched in the jurisprudence of this state, and may not be modified on any

basis but a clear statutory abrogation of the rule." *Bryant v. Shands Teaching Hosp. & Clinics,

Inc.*, 479 So. 2d 165, 168 (Fla. 1st DCA 1985). Indeed, Florida law is clear that "Florida has *no

exception* even where termination is founded on an employee's exercise of constitutional rights"

and one "must rely on statutory causes of action created by the Legislature." *Bruley v. Vill.

Green Mgmt. Co.*, 592 F. Supp. 2d 1381, 1385 (M.D. Fla. 2008) (no claim for wrongful

discharge exists where the employee was "at-will").[1] *See DeMarco*, 360 So. 2d at 136 ("[T]he

employment agreement in the case at bar having been for an indefinite time, Publix could

---

[1] Consistently with Florida law regarding breach of employment contract claims, "Florida [also] does not recognize
an exception to the at-will doctrine in the form of a common-law tort for retaliatory discharge from employment."
*See Wiggins v. Southern Mgmt. Corp.*, 629 So. 2d 1022, 1025 n. 4 (Fla. 4th DCA 1993) (" (*citing Smith v. Piezo
Technology and Professional Administrators*, 427 So.2d 182 (Fla.1983)).

terminate DeMarco for any reason without incurring liability. Thus, Publix was not liable for firing him for the reason that he was exercising his constitutionally protected rights.")

Plaintiff misconstrues the authority he relies on for his purported exception. None of the cases Plaintiff cites support the proposition that a *breach of contract claim* – as opposed to a statutory claim – will lie where there is an at-will employment agreement. *See Laguerre v. Palm Beach Newspapers, Inc.*, 20 So. 3d 392 (Fla. 4th DCA 2009) ("Laguerre was an at will employee of The Post. [W]here the term of employment is discretionary with either party or indefinite, then either party for any reason may terminate it at any time and no action may be maintained for breach of the employment contract.'" (quoting *Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So.2d 182, 184 (Fla. 1983)).  While *Laguerre* cited *Leonardi v. City of Hollywood*, 715 So.2d 1007, 1008 n. 1 (Fla. 4th DCA 1998) for the proposition that an at will employee may be discharged at any time, as long as she is not terminated for a reason prohibited by law, such as retaliation or unlawful discrimination, that was in context of the claim brought by the plaintiff in *Laguerre,* a statutory claim of wrongful discharge in violation of section 440.102, Florida Statutes (2006), the drug-free workplace program under the Workers' Compensation Law. *See id.*  *Laguerre* did not permit a breach of employment contract claim. *See id.* Moreover, *Leonardi v. City of Hollywood*, 715 So. 2d 1007,1009 (Fla. 4th DCA 1998), another case relied upon by Plaintiff, did not even involve a claim for breach of employment contract. Rather, the holding in that case was that reliance on a promise that consisted of at-will employment is unreasonable as a matter of law as such a promise created no enforceable rights on a claim for promissory estoppel. *See id.* at 1009 ("The Court finds that reliance on a promise consisting solely of at-will employment is unreasonable as a matter of law since such a promise creates no enforceable rights in favor of the employee other than the right to collect wages accrued for work performed.").  Similarly,

*Davidson v. Iona-McGregor Fire Protection and Rescue Dist.*, 674 So. 2d 858, 861 (Fla. 2nd DCA 1996), another case relied upon by Plaintiff, again did not involve a claim for breach of employment contract.  Rather, that case involved a statutory claim for obesity discrimination in violation of the Florida Human Rights Act. *See id.*  Plaintiff fails to cite any authority that refutes the consistent holdings that there is no exception under Florida law that that no breach of employment contract claim lies for at-will employees and that one must instead rely on any applicable statutory causes of action for alleged wrongful termination.

Based on the foregoing, the Court will dismiss the breach of contract claim in Count I with prejudice.

B.     Count II:  Defamation

In Count II, Plaintiff brings a claim for defamation against the City.  Plaintiff alleges that the City falsely stated to various media outlets that Plaintiff was terminated as FLPD's Chief of Police for engaging in discriminatory hiring/promotional practices despite encouraging Plaintiff to promote diversity among FLPD's workforce and previously stating to Plaintiff that his hiring/promotional practice were legal. ¶104.  Plaintiff alleges that the City's employee, Mr. Herbst, purportedly made false, defamatory statements about Plaintiff during the course of Mr. Herbst's employment with City and on behalf City. ¶105.  Plaintiff further alleges that Mr. Herbst, outside the scope of his authorized duties as a City employee, falsely stated to various media outlets that Plaintiff was violating City policy and stealing from the City by purportedly working NCAA sporting events on the same days he was scheduled to work at FLPD. ¶106.

In the Motion to Dismiss, Defendant argues, *inter alia*, that Plaintiff's defamation claim must be dismissed as public officials enjoy an absolute privilege from suit for defamation for alleged statements related to the decisions to fire public employees.  Further, as to statements

allegedly made by persons outside of the scope of their employment with City, the City argues the defamation claim must be dismissed because the City is not liable as a matter of law. As explained below, the Court agrees that the defamation claim must be dismissed.

As to statements about Plaintiff's separation from employment allegedly made by City officials acting *in the course of their employment*, based on well-established law, the City has an absolute privilege as to the alleged statements made by city officials in the course of employment, even if the statements are false or malicious. *Miami v. Wardlow*, 403 So.2d 414, 416 (Fla. 1981); *McNayr v. Kelly*, 184 So.2d 428 (Fla.1966). "A defamation suit against a municipality and an officer thereof acting within the scope of his employment is subject to the claim of immunity." *Bauer v. City of Gulfport*, 195 So. 2d 571, 573 (Fla. 2nd DCA1967), *cert. denied*, 201 So.2d 556 (Fla.1967). The question of whether a City employee's allegedly defamatory statements were absolutely privileged is a question of law to be decided by the court. *Resha v. Tucker*, 670 So. 2d 56, 59 (Fla. 1996).

The controlling factor in deciding whether a public employee enjoys absolute immunity is whether the communication was made within the scope of the employee's duties. *Wardlow*, 403 So.2d at 416. Conduct is within the scope of one's employment if it is the type of conduct which the employee is hired to perform, the conduct occurs substantially within the time and space limits authorized or requested by the work to be performed, and the conduct is activated at least in part by a purpose to serve the employer. *Cameron v. Jastremski*, 246 So. 3d 385, 387–88 (Fla. 4th DCA 2018). In this case, the Court determines as a matter of law that the Amended Complaint's allegations that the City falsely stated to various media outlets that Plaintiff was terminated as FLPD's Chief of Police for engaging in discriminatory hiring/promotional practices despite encouraging Plaintiff to promote diversity among FLPD's workforce and

previously stating to Plaintiff that his hiring/promotional practice were legal are protected by Florida's absolute privilege. Accordingly, dismissal of the defamation claim against the City is warranted.

Additionally, as to statements allegedly made by City employees acting *outside the course of employment*, the City is not liable as a matter of law. Section 768.28(9)(a) of the Florida Statutes provides that a state subdivision, such as the City, retains immunity "for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose . . .." Fla. Stat. § 768.28(9)(a).  Because the Amended Complaint alleges that City Auditor Mr. Herbst made allegedly defamatory statements about Plaintiff while acting outside the scope of his employment, the claim against the City relating to those statements must also be dismissed. *See, e.g., Bauer*, 195 So.2d 571 (city cannot be liable for defamatory statements by its employees where statements were made outside of scope of employee's official duties); *Kamenesh v. City of Miami*, 772 F. Supp. 583, 595 (S.D. Fla. 1991) ("Because the only actionable defamation remaining for Plaintiff arises from conduct occurring outside the scope of a state employee's official duties, the City is relieved of liability by operation of Florida Statutes § 768.28(9)(a) and shall be dismissed from Count IV.").

Plaintiff attempts to plead and argue around these fundamental obstacles to his defamation claim by confusingly straddling the line between whether Mr. Herbst was acting inside or outside the course of employment. *See* [DE 22] at pp. 8-10.  However, for the reasons explained *supra*, the City is not liable for defamation under either iteration of the claim.[2]

---

[2] Whether individual liability might attach under one of Plaintiff's theories is not before the Court.

Based upon the foregoing, the Court will dismiss the defamation claim in Count II with prejudice.

### C.  Count III:   *Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, et seq.*

In Count III, Plaintiff brings claims against the City for violation of Title VI, 42 U.S.C. § 2000d, *et seq.* ("Title VI).  Title VI prohibits discrimination based on race, color, or national origin in programs and activities receiving federal financial assistance. *See* 42 U.S.C. § 2000d. ("No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.").

In the Amended Complaint, Plaintiff alleges that the City is a "program" within the meaning of Title VI and is subject to the requirements of Title VI. ¶¶114, 124.  Plaintiff claims that the City retaliated against him by firing him, in violation of Title VI, for Plaintiff having engaged in the alleged protected activity of promoting six (6) minority FLPD employees and nine (9) white males, even though the City repeatedly urged Plaintiff to promote white-male FLPD employees over other diverse, qualified candidates. ¶¶131-140.

In its motion to dismiss, the City argues that the Title VI retaliation claim should be dismissed on two main grounds.  The City contends that Plaintiff cannot establish a basis for Title VI jurisdiction, where he does not allege and cannot establish that the City received federal funding for the "primary purpose" of creating employment and where his allegation is a mere conclusory statement that is devoid of factual support. The City also argues that the Title VI claim must be dismissed on the grounds that Plaintiff has failed to allege and cannot establish that he engaged in any complaint which would constitute protected activity, a necessary element of a retaliation claim.  The Court will address each of these arguments in turn.

First, the City contends that Plaintiff's Title VI claim must be dismissed from the outset, as his allegations fail to establish the threshold basis for Title VI jurisdiction, that the City received federal funding for the primary purpose of creating employment.  In enacting Title VI, Congress' purpose was to ensure that federal funds are not used improperly. *Johnson v. Transportation Agency, Santa Clara Cnty., Cal.*, 480 U.S. 616, 628 n. 6 (1987).

With respect to employment, Congress has strictly limited the application of Title VI:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3. This limitation was designed to clarify that Title VI is narrowly construed and does not "impinge" on Title VII.  *Johnson.*, 480 U.S. at 628 n. 6. Accordingly, Title VI is only applicable to employment discrimination if the employer receives the federal financial assistance for the primary purpose of providing employment. *Id.*

Importantly, "[t]he Eleventh Circuit instructs that whether an employer receives federal funds for the primary purpose of providing employment is a threshold requirement for a litigant to raise a Title VI claim against an employer. *Russell v. Pub. Health Tr. of Miami-Dade Cnty.*, No. 08-23442-CIV, 2009 WL 936662, at *6 (S.D. Fla. Apr. 6, 2009) (citing *Jones v. Metropolitan Atlanta Rapid Transit Auth.*, 681 F.2d 1376 (11th Cir. 1982)). "In order to state a claim under Title VI, not only must be the organization receive federal funding, the federal funding must be for the primary purpose of providing employment." *Hui Li v. Univ. of Fla. Bd. of Tr.*, No. 1:14-CV-236-RS-GRJ, 2015 WL 1781578, at *6 (N.D. Fla. Apr. 20, 2015). Therefore, courts dismiss Title VI claims for failure to allege the requisite factual allegations to establish federal funds whose primary objective was to provide employment. *Russell*, 2009 WL 936662, at *6 (citing cases); *see, e.g., Mayfield v. Hart Cnty. Sch. Dist.,* No. 3:04-CV-09 (CDL),

2006 WL 1652299, at *9 (M.D. Ga. June 9, 2006) ("Since Plaintiff neglected to provide any evidence that HCSD (1) received Federal funding or (2) that the primary purpose of that funding was to provide employment, Plaintiff's claim that an employment decision by HCSD violates Title VI fails as a matter of law."); *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531–32 (10th Cir. 1995) (evidence of receipt of federal monies fail to show that defendants received federal funds for a primary objective of providing for employment because plaintiff "offers no evidence that the federal funds it receives are for a primary objective of providing for employment. Although Reynolds emphasizes that Augustine Lopez was paid by a federal grant, she does not show that the grant was intended primarily to provide employment and not simply to fund various school programs or enrichment activities.")

In *Hui Li v. Univ. of Fla. Bd. of Tr.*, No. 1:14-CV-236-RS-GRJ, 2015 WL 1781578 (N.D. Fla. Apr. 20, 2015), the complaint alleged in relevant part:

> "82. Defendant receives federal funding assistance as well as state funding for the purposes of employment. (Please See Exhibit "B")
>
> 83. Additionally, the Florida Legislature in pledging federal funding stated that a purpose of doing so was to recognize exceptional capabilities to spur innovation, economic development and job creation." (Please See Exhibit "B")
>
> 84. Clearly, the primary purpose of the funding is for employment and research purposes."

*Id.* at *6. The district court dismissed the Title VI claim for failure to state a claim, explaining that the "barren allegations that the Board receives federal funding for the purpose of employment"… "are mere labels and conclusions, and a formulaic recitation of the elements of a cause of action.'" *Id.* at *6 (citing *Twombly*, 550 U.S. at 555).

Here, the Amended Complaint alleges that the City received $7,749,139.00 in federal grants in 2021 and approximately $12,138,184.00 in federal grants in 2022. ¶121.  Plaintiff

further alleges that in 2022 the City budgeted $291,820 of "government funds" towards new, additional positions at FLPD. ¶122.  Additionally, Plaintiff alleges that, "[u]pon information and belief, a portion of the $20,000,000.00 federal financial assistance received by the City between 2021 and 2022 was for the primary objective of providing employment to the City." ¶123.

 Here, the Court finds that Plaintiff's allegations fail to sufficiently allege a nexus between the "federal grants" described in ¶121, the "government funds" budgeted by the City for FLPD positions described in ¶122 (which presumably could be sourced by funds independent of federal grants, like taxpayer monies), and the conclusory allegation in ¶123 that "a portion" of the federal financial assistance received by the City was for the primary objective of providing employment, which is a mere recitation of the elements of a Title VI cause of action. The relevant issue is not whether the City spent its money on a few new positions at FLPD, but specifically whether the City was provided federal funds for the purpose of creating jobs. There are no factual allegations in the Amended Complaint supporting the contention that the City received federal funding *for* the primary purpose of providing employment.[3]

 Accordingly, the Court will dismiss the Title VI claim in Count III for failure to state a claim.

---

[3] Plaintiff misapprehends the holding in *Glover v. Dist. of Trustees of Palm Beach State Coll.*, No. 9:19-CV-80968, 2020 WL 3118469, at *2 (S.D. Fla. Jan. 23, 2020), a case upon which he relies for the proposition that pleading "upon information and belief" is permitted with regard to Title VI federal funds.  In *Glover*, the court was addressing the defendant's argument that plaintiff had failed to plead that the primary purpose of any federal financial assistance that defendant received was to provide for the employment of the specific position at issue. *See* 2020 WL 3118469, at *2 ("Defendant has pointed to no controlling caselaw holding that, to plausibly plead a Title VI claim, it is necessary to allege that the primary purpose of federal financial assistance is to provide employment for the specific position at issue, as opposed to provide employment generally.").

While the Title VI claim must be dismissed for failing to establish the threshold basis for Title VI jurisdiction, *see supra*, the Court nevertheless addresses the City's second, independent, argument for dismissal of the Title VI claim. The City argues that the Title VI claim must be dismissed on the grounds that the factual allegations of the Amended Complaint fail to establish that Plaintiff engaged in any complaint which would constitute protected activity, a necessary element of a retaliation claim.

The Title VII analytical framework for retaliation is also properly used for Title VI cases. *Mayfield*, 2006 WL 1652299, at *10. "[C]ourts regularly use Title VII caselaw to analyze Title VI claims." *Glover*, 2020 WL 3118469, at *2.

To establish a Title VI retaliation claim, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) that he was subjected to a material adverse employment action at the time, or after the protected conduct took place; and (3) that a causal connection existed between the statutorily protected expression and the adverse action. *See McCullough v. Bd. of Regents of the Univ. Sys. of Georgia*, 623 F. App'x 980, 982 (11th Cir. 2015); *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003). "The first element is established if the plaintiff can show that he opposed an unlawful employment practice which he reasonably believed had occurred." *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990) (quoting *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir.1989). "To establish a causal connection in a retaliation case, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *McCullough*, 623 F. App'x at 982 (quoting *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

Defendant argues that Title VI retaliation claim fails to state a claim because, *inter alia*, Plaintiff fails to allege facts showing that he engaged in a statutorily protected expression. In response, Plaintiff does not assert that he has alleged that he complained about or reported any unlawful employment action to his employer.  Rather, Plaintiff takes the position that his action of promoting six (6) minority FLPD employees and nine (9) white males, even though the City repeatedly urged Plaintiff to promote white-male FLPD employees over other diverse, qualified candidates, constitutes Plaintiff having engaged in the alleged protected activity. *See* [DE 18] at ¶¶131-140; [DE 22] at pp. 12-14.  Upon careful consideration of the parties' arguments and the allegations of the Amended Complaint, the Court agrees with Defendant that Plaintiff fails to allege facts demonstrating that Plaintiff engaged in statutorily protected activity.

Protected activities can consist of "opposing unlawful employment practices or participating in making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing regarding an unlawful employment practice." *Shedrick*, 941 F. Supp. 2d at 1367.  The Eleventh Circuit recently stated that "[t]o establish that a plaintiff engaged in statutorily protected expression, we have held that a plaintiff must show that []he "'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (citation omitted).  Additionally, "[t]o qualify as statutorily protected expression, the employee must communicate to the employer that discrimination has occurred." *Cordero v. Florida*, 06-CV-529, 2007 WL 2972988, at *5 (N.D. Fla. Oct. 9, 2007), *aff'd sub nom. Cordero v. Fla. Dep't of Env't Prot.*, 300 Fed. App'x 679 (11th Cir. 2008).

 Here, Plaintiff fails to allege facts giving rise to a plausible inference that Plaintiff's promoting six (6) minority FLPD employees and nine (9) white males "opposed" an unlawful

employment practice within the meaning of Title VI or Title VII.  Absent adequate factual allegations that Plaintiff engaged in a protected activity within the meaning of the statute, Plaintiff's retaliation claim fails.  Accordingly, the Court will dismiss the Title VI claim in Count III for failure to state a claim on this ground as well as for failure to sufficiently allege that that the City received federal funding for the primary purpose of providing employment, *see supra*.

### IV. <u>CONCLUSION</u>

Based upon the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss Plaintiff's Amended Complaint [DE 20] is **GRANTED**;

2. The Amended Complaint [DE 18] is **DISMISSED WITH PREJUDICE** as to Counts I and II and **DISMISSED WITHOUT PREJUDICE** as to Count III; and

3. Although it appears that amendment may be futile, Plaintiff is permitted to file an amended complaint consistent with this Order on or before **October 6, 2023**.  Failure to do so will result in the Court closing this case.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 22nd day of September, 2023.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:
Counsel of Record